IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICH AUREL, #317239                              *
                        Plaintiff,
        v.                                       *    CIVIL ACTION NO. ELH-13-3721

WEXFORD HEALTH SOURCE, INC.                      *
                        Defendant.
                                              *****

MEMORANDUM

Mich Aurel, a self-represented inmate at Maryland's North Branch Correction Institution

("NBCI"), filed suit under 42 U.S.C. § 1983, alleging, *inter alia*, that he has been denied adequate

treatment for Hepatitis A, B & C, tuberculosis, and orthopedic problems while a state prisoner.  ECF

1.[1]  The court ordered plaintiff to supplement his suit (ECF 2), because initially he did not name any

defendants.  Thereafter, plaintiff named Wexford Health Source, Inc. ("Wexford") as the defendant.

ECF 3.[2]

Aurel alleged that he tested positive for tuberculosis and Hepatitis A and B, yet claims he has

not received proper medical treatment for his conditions.  *Id.*  In addition, Aurel filed three separate

letters, construed as supplemental complaints, in which he alleged that his orthopedic shoes and

boots had been confiscated, medical staff refused to measure a raised bump on his arm for a

tuberculosis evaluation, and he was denied treatment for pain in his left ankle, right ear, and throat

and for night sweats, shortness of breath, and fatigue. ECF 12, 13, & 14.   Aurel seeks injunctive

---

[1]  Aurel asserts that he is a citizen of Romania.  ECF 1.  He was confined at Jessup
Correctional Institution until November 2013, when he was transferred to NBCI.  ECF 15-4 at 6-42.
He asserts that he is Jewish, but seems to have abandoned his claim that he has been denied a Kosher
diet since November 1, 2013.  *See* ECF 1.

[2] The correct name is Wexford Health Sources, Inc.  The Clerk shall correct the docket.

relief and compensatory damages of $1,000,000.  ECF 3 at 3.

Wexford has filed a motion to dismiss or, in the alternative, motion for summary judgment, (ECF 15), along with a Memorandum (ECF 15-1) (collectively, the "Motion").  The Motion is supported by about 160 pages of plaintiff's prison medical records as well as the Affidavit of Colin Ottey, M.D.  Dr. Ottey, a licensed Maryland physician, is employed by Wexford and serves as the Medical Director for inmates confined, *inter alia*, at NBCI.  ECF 15-5 ¶ 1.  He avers that he has personally participated in the treatment of plaintiff and has also reviewed Aurel's medical records. *Id*. ¶¶ 4, 5.  In his Affidavit, he recites from the medical records and also provides expert opinions.[3]

Aurel has filed three opposition responses.  *See* ECF 19, 20, 21.  In addition, Aurel has filed his own motion for summary judgment.  ECF 26.  In response, Wexford filed a combined motion to strike Aurel's dispositive motion and an opposition.  ECF 27.

Aurel has also filed motions for injunctive relief, for appointment of counsel, and for a temporary restraining order.  ECF 22 & 28.[4]  Wexford filed a reply.  ECF 23.  Claiming that Aurel has sent counsel a bag of debris, Wexford has also filed a motion to enjoin Aurel from sending any "dust, hair or physical matter" to defendant or its counsel.  ECF 25.  Counsel argues that the forwarding of such materials is inappropriate, serves no legal or evidentiary function, and is potentially harmful to Wexford's counsel and staff.  *Id*.

---

[3] In the factual summary, *infra*, I cite largely from the medical records themselves, rather than from Dr. Ottey's summary of the records.  Notably, Dr. Ottey did not include in his Affidavit any citations to specific pages in the medical records on which he relied, which would have been helpful to the Court.  Notably, the opinions provided by Dr. Ottey are offered based on a reasonable degree of medical probability.  *See, e.g.*, ECF 15-5 ¶ 16.

[4] Aurel is a frequent litigant in this Court, and he filed similar motions for a restraining order in other civil rights cases pending in this court.  *See* ELH-14-374; JKB-14-1473; ELH-14-2813; and ELH-14-3036.

No hearing is needed to resolve the motions.   *See* Local Rule 105.6. (D. Md. 2014).   For the reasons that follow, Wexford's Motion (ECF 15), construed as one for summary judgment, shall be granted.   Wexford's motion for injunctive relief (ECF 25) shall also be granted.   Aurel's motions for injunctive relief, for appointment of counsel, for summary judgment, and for temporary restraining order (ECF 22, 26, 28) shall be denied.   Wexford's motion to strike (ECF 27) shall be denied, as moot.

## I.   Factual Summary

According to Wexford, Aurel is a 49-year old male[5] with a medical history significant for gastroesophageal disease; peptic ulcer disease; positive tuberculosis skin tests in 2002 and 2005 without active disease; positive Hepatitis A & B surface antibody tests in 2009; seasonal allergies; syncopal episodes with implanted cardiac monitor, which was surgically removed in December 2006; micro-fractures of the right heel, diagnosed in 2011, with calcaneous deformity and chronic apophysitis; and a 2004 surgically repaired left lateral ankle fracture with retained hardware.   *See generally* ECF 15-4, Ex. 1 (Aurel's medical records);[6] ECF 15-5, Ex 2 (Affidavit of Colin Ottey, M.D.).

Wexford asserts that prior to July 1, 2012, it was not contractually responsible for providing medical care to Maryland Department of Public Safety and Correctional Services inmates.   Instead, it acted upon referral requests for inmates as part of the utilization review process.   ECF 15-1 at 2-3; ECF 15-5 ¶ 2.   Prior to July 1, 2012, Corizon, Inc., formerly known as Correctional Medical

___

[5] Wexford filed its Motion in May 2014.   Presumably, to protect Aurel's personal identifying information, Aurel's date of birth was blacked out throughout his medical records.   Therefore, I do not know Aurel's date of birth; he may have turned 50 years of age since the filing of the Motion.

[6] All page references are to the electronically filed version on CM/ECF, rather than the page numbers on the documents.

Services, was the contractual provider for primary health care for DPSCS inmates.  Ottey Aff., ECF

15-5 ¶ 2.

A.  Tuberculosis Care

According to the medical records provided by Wexford, Aurel was incarcerated in December

2003.  At his initial intake, he reported a history of "PPD," *i.e.,* positive tuberculin purified, protein

derivative[7] skin test.  ECF 15-4, Ex. 1 at 2-3.  He denied any previous treatment for the disease.  *Id*.

at 2.

On March 7, 2005, after Aurel voiced complaints that he was coughing up blood, plaintiff

was admitted to the infirmary for respiratory isolation to rule out tuberculosis.  *Id*. at 113.  During

this admission, a chest x-ray showed no active infiltrate or pneumonia.  *Id.* at 132.  Serial sputum

tests were administered to determine if Aurel had an active tuberculosis infection.  The smears and

cultures were negative.  *Id*. at 138-141.  On March 10, 2005, Aurel's PPD reading was reported as

positive at 26 mm.  *Id.* at 112.  The following date he was discharged with a diagnosis of bronchitis

and no active tuberculosis.  However, it was recommended that he be treated for a latent tuberculosis

infection ("LTBI") with a nine month regimen of directly observed Isoniazid ("INH") therapy.[8]  *Id.* at

125.  Aurel received this prescribed therapy throughout 2005.  *Id*. at 124.  On March 23, 2009,

Aurel received a chest x-ray which was negative for any active disease.  ECF 15-4 at 133-34.

---

[7]A positive PPD test indicates prior exposure to the tuberculosis germ.  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003839.htm.

[8]Isoniazid is used alone or with other drugs to treat tuberculosis and to prevent it in people who have had contact with tuberculosis bacteria.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682401.  The 12-dose, once-weekly regimen of INH is recommended as an option equal to the standard INH 9-month daily regimen for treating LTBI in otherwise healthy people, 12 years of age and older, who were recently in contact with infectious TB, or who had tuberculin skin test or blood test for TB infection conversions, or those with radiologic findings consistent with healed pulmonary TB.  *See* http://www.cdc.gov/tb/publications/ltbi/treatment.htm.

On February 22, 2010, Aurel received a PPD test which was read as negative at 0 mm. ECF 15-4 at 16. On February 29, 2012, he was seen by Saidatu Baiyewu, LPN, for tuberculosis signs and symptom review. *Id*. at 30. It was noted that he had no active signs or symptoms suggestive of tuberculosis. *Id*. On March 2, 2012, Aurel underwent a chest x-ray which was negative for any active disease. *Id.* at 137. On February 22, 2013, Aurel was seen by Nurse Baiyewu, who noted no active signs or symptoms suggestive of tuberculosis. *Id*. at 38.

Aurel was seen by Nurse Kristi Cortez on December 9, 2013. *Id.* at 50. At that time, Aurel reported respiratory disorders including asthma and tuberculosis. *Id.* Aurel also reported his cell fan had been confiscated and that he needed a medical order for a fan. *Id.* On December 14, 2013, as well as January 8, 12, 19 and 28, 2014, Aurel submitted sick call slips raising complaints of respiratory disease which he believed threatened his life and were exacerbated by his hot cell and the removal of his fan. He also requested a test for tuberculosis. *Id.* at 50-51, 98, 101-103 & 107.

On February 6, 2014, medical staff were called to Aurel's housing unit after a report that Aurel was "laying flat on his back on his cell floor gasping for air." ECF 15-4 at 66. On arrival, Nurse Autumn Durst observed Aurel on his back "taking large deep breaths. . . ." *Id.* A pulse oxygen reading was 98% out of 100% on room air. Aurel's heart rate was between 84 and 92, *id.* at 67, his blood pressure was within normal limits ("WNL"), and no use of accessory muscles for breathing was observed. *Id.* at 66-68. However, Aurel was wheezing. Dr. Ottey was contacted and instructed Durst to administer a nebulizer[9] treatment. Plaintiff completed the treatment without difficulty. *Id.* at 67.

---

[9] A nebulizer is a device that converts liquid medicine into a fine mist inhaled by breathing through a mouthpiece or mask. *See* http://www.respistory.com/c/nebulizers.html?utm_source.

That same day, Aurel was seen by Ava Joubert, M.D., to whom Aurel reported that his lung problems were returning due to the hot and dry air in his cell.  ECF 15-4 at 69.  Aurel's lungs were clear to auscultation and percussion.[10]  His pulse oximetry[11] was 99% and his mouth, nose, and throat were found to be unremarkable.  *Id.* at 69-70.   A chest x-ray was ordered and the results showed clear lung fields and no acute or active disease.  *Id.* at 138.  Aurel was advised to increase his fluid intake and to try placing a moist blanket over his heating vent to improve humidity in his cell.  *Id.* at 69-70.

On February 20, 2014, Aurel was seen by Physician's Assistant ("PA") Quinta Lum and was informed that his last PPD test was negative.  *Id.* at 74-75.  On February 26, 2014, he was seen by Nurse Travis Barnhart and informed the nurse that he had been infected with tuberculosis and never treated for the disease.  *Id.* at 79.  Barnhart instructed Aurel that his last chest x-ray results from February 2014 showed both lung fields as clear with no acute disease.  *Id.*

In his Affidavit, Dr. Ottey opined: "Plaintiff does not have TB."  ECF 15-5 ¶ 10.  He notes that Aurel was treated for LTBI "as a prophylactic measure."  *Id.*  Moreover, Aurel was "repeatedly" told that he does not have latent or active TB.  *Id.*

### B.  Hepatitis Testing and Treatment

On October 9, 2009, a hepatic profile study was ordered for Aurel.  ECF 15-4 at 12-14.  On December 22, 2009, the results of that study detected positive Hepatitis A total antibodies and

---

[10] Ausculatory percussion is the sound produced by percussion in a physical examination when the body is struck with short, sharp blows of the fingers in order to determine the size, position, and density of the underlying parts by the sound obtained.  *See* http://medical-dictionary.thefreedictionary.com/auscultatory+percussion.

[11] Pulse oximetry is a way to measure how much oxygen the blood is carrying by applying a small device called a pulse oximeter to a finger, toe, or ear without needing to be stuck with a needle.  *See* http://patients.thoracic.org/information-series/en/resources/ats-patient-ed-pulse-oximetry,pdf.

positive Hepatitis B surface antibodies.  *Id.* at 147.  Wexford maintains, through the Affidavit of Dr. Ottey, the Medical Director for state inmates confined in the Cumberland, Maryland region, that these test results indicate past exposure but immunity to both the Hepatitis A and B virus, from either past disease exposure or immunization.  ECF 15-5 ¶ 11.   Moreover, Aurel's Hepatitis C test was entirely negative.  *Id.*

On April 6, 2010, Aurel was seen in the Chronic Care Clinic ("CCC") for an upper right quadrant abdominal tenderness.  ECF 15-4 at 18-20.  A more comprehensive hepatic panel was ordered to rule out the presence of an acute hepatitis virus.  The results of these tests were all negative.  ECF 15-4 at 149.  The test results were discussed with Aurel on June 8 and August 24, 2012, while he was in the CCC.  *Id.* at 21-22 & 34-35.

On July 29, August 4, and August 22, 2013, Aurel submitted sick-call slips requesting confirmation of his hepatitis diagnosis and reporting yellow or orange urine.  *Id.* at 89-91.  He submitted additional sick-call slips, maintaining that he was infected with Hepatitis A, B & C and that he wanted treatment.  *Id.* at 94, 97.  He was seen by Nurse Barnhart on December 30, 2013, who noted that Aurel's previous hepatitis panel results were all negative.  *Id.* at 55.  A repeat panel was ordered, and the reported results were negative for Hepatitis B and indeterminate for Hepatitis A.  *Id.* at 55 & 153.  Further testing was ordered for Hepatitis A, which was completed in January 2014.  It reflected a prior history of Hepatitis A virus but the absence of an active Hepatitis A infection.  *Id.* at 153-54.  On February 26, 2014, Aurel was again seen by Nurse Barnhart.  He was advised that his hepatitis panels were negative for active disease.  *Id.* at 79.

Dr. Ottey avers that Aurel is "currently immune from the virus and unable to transmit the virus to others." ECF 15-5 ¶ 15.  He also opines that because Aurel has shown no active Hepatitis virus during his confinement he has not and does not require treatment for hepatitis.  *Id.*¶ 16.

## C.  Orthopedic Equipment

Aurel has a history of a 2004 surgically repaired left ankle fracture with retained hardware and micro–fractures of the heel of the right foot with a calcaneus[12] deformity and chronic apophysitis,[13] diagnosed in February 2011.  ECF 15-4 at 23-24, 114; ECF 15-5 ¶ 17.  He was issued boots and high top tennis shoes for ankle support in May of 2005.  ECF 15-4 at 126.

In March 2011, Aurel requested an ankle brace for heel pain.  He was advised that the brace would be of no benefit for his heel pain.  Rather, he was told to refrain from playing football to aid in the healing of micro-fractures and to relieve his chronic heel pain.  Aurel declined, stating that he would continue to play football.  ECF 15-4 at 23-25.

On October 12, 2012, Aurel received a medical evaluation of his left ankle.  *Id*. at 37.   He complained that his ankle was swelling because his tennis shoes had been confiscated by prison custody staff.   During the medical evaluation, it was noted that Aurel was wearing a left ankle support.  *Id*.  Aurel was referred to PA Mike Romain and, on October 18, 2012, Aurel reported that the shoes recommended by podiatry had been confiscated.  *Id.* at 38.  Review of Aurel's medical records revealed that in 2005, boots and high top tennis shoes had been recommended by the

---

[12] The calcaneus is the largest of the tarsal bones and is situated at the lower and back part of the foot forming the heel. A deformity may cause heel pain. *See* http://www.lexic.us/definition-of/calcaneus.

[13] Calcaneal apophysitis, also known as Sever's Disease, is a painful inflammation of the heel's calcaneal apophysis growth plate, believed to be caused by repetitive micro-trauma from the pull of the Achilles tendon on the apophysis.  *See* http://www.uwhealth.org/uw-doctors/calcaneal-apophysitis-severs-disease/13067.

podiatrist.   Romain advised Aurel that he would provide him with the paperwork to obtain an exception from prison custody for his high top sneakers and a medical assignment for same was issued.  *Id*. at 38, 157.

Wexford asserts that Aurel raised no complaints regarding his ankle until March 17, 2013, when he submitted a sick-call slip complaining of heel pain and problems with walking.  *Id.* at 87. Four days later he was seen by PA John Moss.  *Id.* at 40-41.  Aurel requested a bottom bunk assignment due to his old fracture, but voiced no complaints of pain.  An examination of his musculoskeletal system and extremities was found to be unremarkable, with no joint tenderness or deformity.  Moss deemed the medical assignment to a lower bunk as unnecessary.  *Id.*

On or about November 1, 2013, Aurel was transferred from JCI to to NBCI, and was evaluated at NBCI on November 6, 2013, by Nurse Practitioner Peggy Mahler.  ECF 42-45.  Aurel advised that his orthopedic shoes had been confiscated by prison custody and requested a bottom bunk. *Id.*  No left ankle edema was noted.  Aurel was advised to inquire with custody as to the status of his shoes.  On November 26, 2013, he was seen by Nurse Carla Buck and requested the return of his ankle brace and a back brace, both of which he claimed had been confiscated on his arrival at NBCI.  *Id.* at 46-47.  Examination of his left ankle revealed no deformity or swelling.

Aurel submitted a sick call slip on December 5, 2013, inquiring about his orthopedic shoes, ankle, brace and back brace.  *Id.* at  96.  In response, he was reevaluated by Nurse Buck.  Aurel was noted to ambulate into the medical room without a limp.  *Id.*   He was advised that his need for orthopedic shoes and braces would be directed to a mid-level provider.  *Id.*

Throughout December 2013, and into January 2014, Aurel submitted sick-call slips regarding his left ankle and orthopedic shoes.  *Id.* at 98-100.   On January 15, 2014, he was seen by Nurse

Cortez for his complaints of sharp ankle pain. On examination, Aurel's ankle had a normal range of motion, gait, strength, and sensation, but he reported pain with movement. He was assessed with muscle strain and given one tube of muscle rub. He was also instructed on exercises to relieve discomfort and advised to apply hot and cold compresses to the ankle and to follow an exercise program. ECF 15-4 at 58-60.

On January 23, 2014, Aurel was seen in response to a sick call slip regarding his ankle and orthopedic shoes. His weight-bearing ability and gait were normal and he had no swelling or discoloration of the ankle and good pulses. *Id.* at 61. Five days later, on January 28, 2014, Aurel was seen by PA Lum with regard to his orthopedic shoes. He was advised that the property unit was contacted by the Administrative Director of Nursing and that medical staff was awaiting a response regarding the return of Aurel's shoes. *Id.* at 63-65. On February 28, 2014, Aurel was again seen by Lum and was advised that DPSCS had determined that the boots and high top sneakers in question did not meet the criteria for orthopedic shoes and could not be released to Aurel. *Id.* at 80-81. On March 3, 2014, Aurel was scheduled to be seen in sick call for ankle pain, but refused the appointment and executed a release of responsibility. *Id.* at 78.

Wexford maintains that Aurel continues to have access to medical staff through the sick-call process for complaints related to his ankle. ECF 15-1 at 13. Moreover, Dr. Ottey notes that plaintiff's ankle injury is more than 10 years old, and he opines that it "appears to have adequately resolved." ECF 15-5 ¶ 26. Indeed, he notes that plaintiff actively engaged in football in March 2011. *Id.* In Dr. Ottey's opinion, referral to an orthopedist is "not medically indicated," nor are orthopedic shoes "clinically warranted." *Id.*

### D.  Aurel's Responses/Motion for Summary Judgment

In his opposition responses, Aurel continues to claim that he has been infected with tuberculosis and Hepatitis A, B & C, has suffered from the diseases' symptoms since 2005, and has been denied medical treatment.  He reiterates the claims raised in his original complaint and complains of pain to his left ankle from an injury in 2004.     ECF 19, 20, & 21.  He has also submitted an opposition accompanied by copies of his sick-call requests filed after this case was instituted.  ECF 21.

In his motion for summary judgment, Aurel complains that since 2009, he has had symptoms of abdominal pain, nausea, fainting, difficulty breathing, dizziness, changes in his voice, gastrointestinal distress, constipation, thyroid dysfunction, swelling in his throat, and an allergic reaction to soy in his food.  ECF 26.  Wexford seeks to strike Aurel's motion for summary judgment, arguing, *inter alia*, that he is adding factual allegations without leave of the court.  ECF 27.

## II.      Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for

summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. In that circumstance, the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[14]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot

---

[14] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration

complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).  "[T]to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  Moreover, a non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to

---

of the motion the supporting extraneous materials.").

file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Wexford has submitted extensive medical records documenting Aurel's prolonged care and treatment.  Aurel has filed several responses to Wexford's Motion, as well as his own motion for summary judgment.  He has not submitted a Rule 56(d) affidavit, however.  In my view, it is appropriate to consider Wexford's Motion under summary judgment principles, because it will facilitate resolution of the case.  And, I shall of course consider Aurel's summary judgment motion under the same principles.

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). As the Fourth Circuit

recently observed, Fed. R. Civ. P. 56 "is a mechanism to obviate trial . . . ." *Boyer-Liberto v. Fontainbleau Corp.*, 752 F.3d 350, 355 (2014), *rehearing en banc granted* (July 1, 2014).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' " showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied,* 541 U.S. 1042 (2004); *see also Celotex Corp.,* 477 U.S. at 322–24. And, a party must rely on facts that would be admissible at trial. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Anderson,* 477 U.S. at 248. In contrast, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 248. In other words, "[f]actual disputes that are irrelevant ... will not be counted." *Id.* Thus, "the mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.,* 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion,* 720 F.3d 169, 173 (4th Cir. 2013). The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

To be sure, the court may not make credibility determinations on summary judgment. *Black v. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006). *See, e.g., Boone v. Stallings,* ____ Fed. App'x. ____, No. 14-6521 (4th Cir. Sept. 11, 2014) (per curiam). On the other hand, the court should "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (citation and internal quotation marks omitted).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, as noted, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

Section 1983 of title 42 of the U.S. Code "'is not itself a source of substantive rights,' but

provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)).  A lawsuit under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707 (1999).  To proceed under § 1983, a plaintiff must allege that 1) a right secured by the Constitution or laws of the United States was violated, and 2) that the alleged violation or deprivation was committed by a "person acting under the color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988); *see Baker v. McCollan*, 443 U.S. at 140; *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 112 (2011).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)).

In order to state an Eighth Amendment claim for inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey,* ____ F.3d ____, No. 13-7291, slip op. at 15 (4th Cir. Dec. 18, 2014).   A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or ensure the needed care was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Moreover, in a case involving a claim of deliberate indifference to a medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

The subjective component of the Eighth Amendment claim requires "subjective recklessness" in the face of a serious medical condition. *Farmer*, 511 U.S. at 839-40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n.2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Notably, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F. 3d

164, 166 (4th Cir. 1998).  Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk. . . ."  *Brice,* 58 F.3d at 105.  But, without evidence that a healthcare provider linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met.  *Johnson,* 145 F.3d at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge).

Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice. Moreover, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*."  *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977).  And, an inmate's mere disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action.  *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir.1977); *Russell v. Sheffer,* 528 F.2d 318 (4th Cir. 1975).  Moreover, prison officials are entitled to rely on medical judgments and the expertise of prison physicians and other medical providers concerning the course of treatment deemed necessary for prisoners. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with a prisoner's medical treatment ordered by such personnel).

Of import here, there is no respondeat superior liability under § 1983.  *Monell v. New York*

*Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978); s*ee Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.

2004) (no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir.

2001) (no respondeat superior liability in a Bivens suit).  Liability of supervisory officials "is not

based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that

supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor

in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268

F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor

had actual or constructive knowledge that his subordinate was engaged in conduct that posed a

pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the

supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or

tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link

between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

With these principles in mind, I turn to the facts.

There is no dispute that Aurel has been examined, treated, tested, and retested repeatedly

throughout his incarceration.  His extensive medical records reflect that DPSCS attended to Aurel's

many concerns about his health.  He has been seen by nurses, physicians' assistants, and physicians

while in prison.  Further, the medical record is replete with many objective tests, including chest x-

rays and screening panels, which show that Aurel has no active tuberculosis or Hepatitis A, B or C.

In addition, his complaints of ankle pain were addressed and he was diagnosed with a muscle strain;

no objective evidence was found of problems with the ankle's range of motion or abnormalities with

Aurel's gait.  Although Aurel may be dissatisfied with the course of treatment and the health care he received, the extensive testing and treatment he received clearly meet the minimum constitutional requirements.  No Eighth Amendment violation has been demonstrated.

Aurel also seeks injunctive relief and a temporary restraining order, complaining that for nine months he has had symptoms of throat hoarseness, skin rashes, night sweats, fatigue, chest pain, shortness of breath, coughing, and ankle pain.  ECF 22.  He contends that he is being discriminated against due to his race, religion, and foreign background.  ECF 28.

Under the law in this circuit, a party seeking a preliminary injunction must demonstrate: (1) by a "clear showing" that he is likely to success on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.7, 20-24 (2008); *Real Truth About Obama, Inc. v. Federal Election Com'n,* 575 F. 3d 342, 346-47 (4th Cir. 2009), vacated on other grounds, 558 U.S.1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th  Cir. 2010) (per curiam).

The *Winter* standard requires the district court to find that the party seeking the injunction has made a "clear showing" that he is likely to succeed on the merits.  *Winter,* 555 U.S. at 22.  This standard compels the moving party to show that he is *likely* to prevail.  Regardless of the balance of hardships, it is insufficient for the party to show only that "grave or serious questions are presented" in the litigation.  Second, the moving party must make a clear showing that he is likely to be irreparably harmed if preliminary relief is denied.  To meet this test, the party must show more than a mere *possibility* of harm.  Third, the moving party must show that the balance of equities tips in his favor.  *Id.* at 20.  Fourth, the district court must consider whether grant or denial of the injunction is

in the public interest.  The court must give "particular regard" to the public consequences of granting a preliminary injunction.  *Id.* at 9, 24; *Real Truth,* 575 F.3d at 347.  Each requirement must be fulfilled as articulated.  *Id.*

Aurel has failed to show that he will succeed on the merits of his case and that he will be subject to immediate and irreparable harm if emergency relief is not granted.  There is no demonstration of deliberate indifference on the part of Wexford or medical staff.  Injunctive relief is not warranted.

### V. Conclusion

For the aforementioned reasons, Wexford's Motion, construed as one for summary judgment, is granted, and Aurel's motion for summary judgment is denied.  In light of this decision, Aurel's motions for injunctive relief, for appointment of counsel, and for a temporary restraining order shall be denied.

A separate Order follows.

Dated: January 7, 2015                                    _____/s/_____

                                                         Ellen Lipton Hollander
                                                         United States District Judge